UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL FORD,<br><br>          Plaintiff,<br><br>    v.<br><br>THE HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, et al.,<br><br>          Defendants. | No. CV 06-3665-GW<br><br>STATEMENT OF DECISION |

## I.    INTRODUCTION

Plaintiff Michael Ford ("Plaintiff") brings this action against defendants Hartford Life and Accident Insurance Company ("Hartford" or "Defendant") and the Long Term Disability Plan of Brown & Sharpe Manufacturing Company ("LTD Plan") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. ERISA allows an individual who is denied benefits under his or her employer's group long term disability policy to challenge that denial in federal court. 29 U.S.C. § 1132(a)(1)(B); see also Metropolitan Life Ins. Co. v. Glenn, ___ U.S. ___, 128 S.Ct. 2343 (2008).

The matter was "tried" to this Court based upon the Administrative Record ("AR")[1], "surveillance CDs" identified in the AR[2], the Opening Trial Briefs and the

---

[1] References to pages in the Administrative Record will be to "AR at ___".

[2] The surveillance materials were presented to this Court on compact discs but are referenced in the AR as being on a video tape format.

Reply Briefs from both sides, Supplemental Trial Briefs from both sides requested by the Court, and the oral arguments of counsel. Having reviewed all of those items and the other materials in the case file, the Court issues this Statement of Decision.

## II.     FACTUAL FINDINGS

### A. The Policy

A Group Long Term Disability Policy ("Policy") with an effective date of April 1, 1999 was issued by the Continental Casualty Company ("CCC")[3] to the Brown & Sharpe Manufacturing Company ("BSMC"). See AR at 003. All employees of BSMC who worked at least 20 hours per week were covered. Id. at 005. BSMC paid for the entire cost of the coverage. Id. at 008.

Under the Policy, if an employee became "disabled" and that condition continued through an initial "elimination period" of 13 weeks, the employee would receive a "monthly benefit" consisting of 60% of his or her monthly earnings (minus certain deductible sources of income) up to a maximum benefit of $15,000 a month. Id. at 005 and 008-11. During the first 24 months following the elimination period, "disability" is defined in part as being "continuously unable to perform the material and substantial duties of your regular occupation." Id. at 009. After monthly benefits have been paid for 24 months, "disability" is defined in part as being "continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience." Id.

As provided in the insurance certificate:
> When making a benefit determination under the policy, *We* [i.e. CCC] have discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy. [Italics in original.]

AR at 007. During an employee's period of disability, he or she "may be asked to

---

[3] Both Plaintiff on page 1 of his Opening Trial Brief and Defendants on page 3 of their Opening Trial Brief indicate that, at some point, Hartford acquired CCC's disability insurance business including the policy at issue herein.

submit proof that *You* continue to be *Disabled* and are continuing to receive *Appropriate and Regular Care* of a *Doctor*." Id. at 015. Further, CCC had the right to have a doctor examine the employee at CCC's expense "as often as reasonably necessary while the claim continues. Failure to comply with this examination will suspend or terminate benefits, unless *We* agree *You* have a valid and acceptable reason for not complying." Id.

### B. Plaintiff's Disability And Defendant's Handling Of His Claim

Plaintiff began work at BSMC on March 20, 1995. AR at 310. On April 3, 2000 he submitted an "Initial Claim Report For Group Long Term Disability" ("Claim"). Id. at 310-11. He indicated that his occupation was a "field service engineer" which involved "service & repair of coordinate measuring machines in customers' facility [sic]." Id. at 310. Listed as the "major physical demands" of that job were "Travel by air & automobile, standing, walking, lifting, sit/stand reaching, squatting/stooping, twisting. Carry up to 75 lbs." Id. The "skills required" for that position were "mechanical/elec. trng." Id. His base salary was $1,754.96 biweekly. Id.

In his Claim, Plaintiff indicated that he was injured on May 29, 1998 when he was "lifting [a] tool box" at a "customer site". Id. at 311. The last day that he worked prior to his disability was January 3, 2000.[4] Id.

In April 2000, Plaintiff began treatment at the Physician's Pain Management Clinic in Tyler, Texas with Doctors Kenneth Fults and R.W. Rodgers. AR at 812-13. On April 20, 2000, Dr. Kenneth Fults submitted an "Attending Physician's Statement" indicating that Plaintiff had "multi level disc disruption syndrome-lumbar spine" which rendered him incapable of performing "all duties" of his job. Id.

Plaintiff received a letter dated May 9, 2000 from CCC notifying him that: 1) his claim for disability benefits had been approved; 2) the "period from 12/24/99 through

---

[4] As indicated in the Claim, the last day Plaintiff actually worked was December 23, 1999 and there was a "Christmas Shutdown" from December 24, 1999 to January 3, 2000. AR at 310.

1  3/23/00" had been used to satisfy the 13 week elimination period; and 3) his benefit start
2  date was "3/24/00". Id. at 672. Plaintiff was informed that "the policy requires that you
3  provide proof of your continuing disability." Id. at 673.

4      On May 31, 2000, Dr. Mignucci (a spine surgeon) wrote to Hartford's Claim Unit
5  indicating that he had recommended that Plaintiff undergo a lumbar fusion at the L4-L5
6  region. AR at 807. He opined that: "If this gentleman does not have surgery he will
7  require a functional capacity evaluation to determine his degree of function ability, and
8  based on this, release him to go back to work if possible. It will be very likely that he
9  will not be able to perform the job that he was doing in the past." Id.

10     Between April 2000 and January 2001, Dr. Fults consistently reported that
11 Plaintiff had "chronic, intractable lumbar pain syndrome" and other medical problems.
12 AR at 778-83. On November 22, 2000, Dr. Rodgers informed Defendant that "I do not
13 anticipate Mr. Ford returning to employment anytime in the near future within the next
14 twelve months, if ever." Id. at 800.

15     On January 17 and 18, 2001, Plaintiff was sent for a functional capacity
16 evaluation ("FCE") with physical therapist Terry Bunker. AR at 748-50. In his
17 Summary Report, Bunker stated that Plaintiff "was unwilling or unable to perform most
18 of the functional testing tasks" because of his "subjective limitations and pain
19 complaints." Id. at 748. "No valid conclusions could be correlated for this testing . .
20 . ." Id. at 750.

21     In a "Discharge Summary Impairment Rating" dated February 12, 2001, Dr. Fults
22 stated that: "At this time, patient has a failed back syndrome. He is in a great deal of
23 pain and discomfort." AR at 785. Dr. Fults further indicated that: "On testing of the
24 patient, lumbar ranges of motion were abnormal, and we found a 12% whole person
25 impairment attributable to lumbar loss of range of motion. Patient also has . . .
26 surgically treated disc lesion with residual symptoms, attributable whole person
27 impairment of 10%. Using the combined values chart, we find that the patient has a
28 whole person impairment of 21%." Id.

In an April 23, 2001 letter, Hartford wrote to Plaintiff that, because his FCE was inconclusive and his doctors had failed to supply "functional" medical updates, there was a question as to his occupational limitations. AR at 711. He was reminded that his "own occupation" benefits would end on March 23, 2002 at which point he would have to qualify for benefits under the "any occupation" criteria. Id.

In January 2002, Plaintiff was seen by Dr. Thomas Grahm who opined that he had "very significant discogenic low back pain with radicular pain secondary to a recurrent disc rupture at L4/5." AR at 700. Hartford obtained video surveillance of the Plaintiff taken on January 21-22, 2002 where he was observed performing various physical activities such as driving, opening and closing doors, carrying sacks, sitting, standing and walking (albeit with a "slight difference in stride"). Id. at 637-40. Hartford notified Dr. Rodgers of those observations but Dr. Rodgers still opined that Plaintiff was incapable of performing full-time work that was essentially seated even with an allowance for his ability to change positions or stand at his own volition. Id. at 698.

In a February 14, 2002 letter, Hartford informed Plaintiff that his "own occupation" benefits would end on March 23, 2002 and no further payments would be made under the policy because his medical/vocational documentation did not support his being disabled from "any occupation at this time." AR at 668. On April 17, 2002, Plaintiff filed an appeal from that decision stating, in part, that he would be having the back surgery that certain of his doctors had been recommending. Id. at 621-23. Dr. Grahm indicated that Plaintiff had undergone a discogram and he was advised to have a "two-level transverse interbody fusion with posterolateral fusion at L4/5 and L5/S1." Id. at 623. Dr. Grahm opined that Plaintiff could not "return to work at this time." Id. Hartford began making "any occupation" benefit payments. See e.g. Id. at 614.

In May of 2003, Hartford received a phone call from BSMC's broker stating that the employer had received anonymous phone calls saying that Plaintiff was not disabled and that "he can ride a horse, fix a vehicle, etc." AR at 079.

On February 20, 2004, a lumbar mylogram was performed on Plaintiff by Dr. Gordon which showed a "moderate annular disc protrusion L4-L5 . . . [,] displacement of the left L5 nerve root with poor filing of the right L5 nerve root . . . . [and] very mild annular disc protrusion L5-S1." AR at 440-41. On June 22, 2004, Plaintiff underwent a lumbar fusion operation performed by Dr. Gordon. Id. at 444. He was discharged from the hospital on June 26 "in stable and satisfactory condition" with "activity as tolerated but limitation as instructed." Id. at 442. On July 26, 2004, Plaintiff was seen by Dr. Gordon who observed that the "lumbar wound is well-healed" and that there were no "significant neurogic defects." Id. at 415. While Plaintiff did have a moderate amount of pain, Dr. Gordon thought that it was "muscular pain and postop nerve root irritation." Id.

In an October 6, 2004 report, Dr. Rodgers indicated that Plaintiff's pain returned shortly after surgery and he has a "chronic, intractable situation . . . ." AR at 396. Dr. Rodgers stated that Plaintiff "could not be gainfully employed in any position. At this time, he is determined to be permanently disabled . . . ." Id. On October 22, 2004, Dr. Rodgers wrote that "recent re-surgery with fusion of the lumbar spine . . . was much more successful than his previous surgeries." Id. at 395. Plaintiff had purportedly informed the doctor that "if he can get off the OxyContin onto something like occasional Vicodin he feels like he could return to the work force . . . ." Id. Dr. Rodgers concluded that his "Prognosis is actually very good at this point." Id.

On November 17, 2004, Dr. Rodgers indicated that Plaintiff had fallen about four times and injured his left knee. AR at 393. Between November of 2004 and March of 2005, Plaintiff saw Dr. Rodgers monthly with complaints of back and knee pain. Id. at 364-69. On March 29, 2005, Dr. Rodgers wrote that Plaintiff still had the back and knee pains but that he had sold his home and was moving to California where "he has family out there and prospects of employment." Id. at 364. On March 29 through 31, 2005, surveillance was conducted on Plaintiff where he was observed driving for extended periods, carrying bags and other small items, etc. Id. at 330-45. As

summarized in the investigator's report:

> Surveillance was conducted on Tuesday, March 29; Wednesday, March 30; and Thursday, March 31, 2005. On Tuesday, the subject was away from his residence two times for a total of three hours and forty-five minutes, and drove approximately fifty-one miles. On Wednesday, the subject was away from his residence five times for a total of two hours and forty-five minutes, and drove approximately twenty-four miles. On Thursday, the subject was away from his residence two times for a total of two hours and ten minutes, and drove approximately fifty-five miles. On Tuesday, the subject went to a doctor's office, a water supply company, a bank, a pharmacy, a packaging store, a lube/service station, a restaurant, the post office, an elementary school, a middle school, and a high school. On Wednesday, the subject went to a middle school twice, a hardware store twice, and the post office twice, a packaging store, a high school, an elementary school, and a convenience store. He did have a brace on his left knee. On Thursday, the subject went to a bank, a packaging store, a restaurant, two stores, and a gas station. The subject bent at the waist at a vending machine, walked in a normal fashion, shopped normally, entered, operated, and exited a motor vehicle. The subject was not observed using a cane at any time, but did wear the brace on his left knee during the two days of the surveillance.

Id. at 330.

On June 15, 2005, Hartford sent a copy of the surveillance video to Dr. Rodgers for his response, along with a form for the doctor to set restrictions on Plaintiff's ability to perform "seated type, sedentary work". AR at 349. On June 27, 2005, Dr. Rodgers responded as follows: "Severe limitations on lifting, bending or standing. He must be allowed to change positions at will. He has moved to California to seek work in the robotics field for which he is trained. Last office evaluation was 3-29-2005." Id. at 319. A copy of the video was also sent to Dr. Soheil who was purportedly Plaintiff's new physician in California. Id. at 315. On July 21, 2005, Hartford received a phone call from Dr. Soheil indicating that he did not feel comfortable responding to the inquiry as to Plaintiff's functional capacity as he was only treating the Plaintiff for purposes of his worker's compensation injury. Id. at 40-41.

In August 2005, Hartford sent Plaintiff's medical records to Dr. Bhupendra Gupta for review. AR at 304-06. Dr. Gupta, in addition to reviewing the materials, discussed

Plaintiff's conditions with Dr. Rodgers. Dr. Gupta noted:

> I have reviewed the case with Dr. Randall Rogers in a telephone conversation. Clinical findings are discussed with Dr. Randall Rogers in detail. Dr. Randall Rogers feels that Mr. Michael Ford can not do sedentary level duty work. Dr. Randall Rogers could not give any objective reasoning, however states that Mr. Michael Ford cannot do anything due to failed back surgery times two.
> When I mentioned it to Dr. Rogers the surveillance videos [sic], and that Mr. Ford was observed to sit, stand, walk, carry bags, drive, rotate while sitting without any sign of discomfort for more than three hours at a time, Dr. Rogers told me that surveillance videos was [sic] a bunch of nonsense. Dr. Rogers told me that Mr. Michael Ford is a single parent. As per Dr. Rogers, Mr. Michael Ford has to go and do things for his kids, like picking them [sic], dropping them at school, buying groceries, and going to the post office. Dr. Rogers would not give me any objective findings that would indicate why Mr. Michael Ford cannot work.

Id. at 305. While Dr. Rodgers continued to assert that Plaintiff could not be employed due to his back problems, Dr. Gupta concluded that Plaintiff could do "sedentary level duty work." Id at 305-06. On August 29, 2005, Tiffany Dyenson, a Rehabilitation Case Manager at Hartford, identified certain types of sedentary jobs which Plaintiff supposedly could perform in his current condition. Id. at AR 288-303.

On August 31, 2005, Hartford sent to Plaintiff a letter notifying him of its decision (and its concomitant reasoning) finding that he was no longer totally disabled as defined in the Policy and further notifying him of his right to appeal the decision. AR at 131-36. On January 13, 2006, Plaintiff sent an appeal letter to Hartford which included a January 2, 2006 medical report from Dr. Rodgers[5] and notice that he was scheduled for knee surgery in February with Dr. Kee Wong. Id. at 206-09. In addition, Plaintiff raised the following conflict of interest contention:

> Since The Hartford both funds and administers the plan, there is an apparent conflict of interests and a decision to deny benefits is viewed very skeptically. See Atwood v.

---

[5] In the January 2, 2006 Report, Dr. Rodgers states that Plaintiff "is in today for a re-evaluation of his situation." However, Dr. Robert Pick notes that in a "call-back" telephone conversation with Rodgers on April 11, 2006, Rodgers indicated that Plaintiff's last office visit was on December 7, 2005. AR at 185-86.

-8-

> Newmont Gold, Inc., 45 F.3d 1317, 1323 (9th Cir. 1995) and Friedrich v. Intel, 181 F.3d 1105 (1999-9th Cir.) [sic]. What these cases hold is that the beneficiary initially has the burden of providing material probative evidence beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrative fiduciary obligation to the beneficiary. Then if the beneficiary comes forward with this evidence, then the fiduciary (i.e., The Hartford) bears the burden of producing evidence to show that the conflict of interest did not effect the decision to deny benefits. If they are unable to do so, then the court reviews the decision to deny under a de novo standard of review.

Id. at 208.

In Dr. Rodgers' January 2, 2006 report, he does not articulate any actual examination of the Plaintiff other than taking a verbal report from the Plaintiff and commenting on the March 29-31, 2005 surveillance video. Id. at 209. As to the latter, Dr. Rodgers states:

> I have also reviewed this video and I saw nothing that would indicate to me this patient could sustain useful employment. He walks with an antalgic gait. He has to support himself on cabinets to speak with the attendants while having his car serviced. He has to lean on a vending machine to get something out of it to eat while his car is being serviced. He went to get packing materials to move and had to have someone load it for him in the car. He is a single parent and had to pick up his children at school and had to drive the car to the different schools to pick up his children. Mr. Ford did not get out of his car to greet his children; they instead came to the automobile and let themselves in.

Id. This Court has viewed the surveillance CDs in their entirety twice and would overall disagree with Dr. Rodgers' observations. While Plaintiff does appear to walk with a pronounced gait, he has no problem driving, sitting in his vehicle for extended periods, getting in and out of his car with packages, opening doors, etc. While at one store he did receive assistance from a store employee, in the other instances he carried the purchases (including unfolded boxes and other materials) to his car. Further he did not appear, at least to this Court, to have been supporting himself on cabinets while speaking to attendants or leaning on a vending machine to get something out of it. As to picking up his children from school, they do not appear to be of such tender age as

1   to require a parent to get out of a car to open the vehicle door for them.

2     In February of 2006, Plaintiff had surgery on his left knee. AR at 204. Dr. Wong indicated that "the patient has also had previous back surgery with fusion and is unable to return to work because of this." Id.

  In April of 2006, Hartford sent Plaintiff's medical records to Dr. Robert Y. Pick who is Board Certified in Orthopedic Surgery for an independent review.[6] AR at 151. Dr. Pick's report indicates that he reviewed records from Hartford, Plaintiff, the Texas Worker's Compensation Commission, Physician's Pain Management of Tyler/Dr. Fults, Physical Therapy Services, Dr. Grahm, East Texas Medical Center, Dr. Gordon, Texas Spine and Joint Hospital, Dr. Rodgers, Care First Medical Associates, Dr. Robert W. Dennis, Tyler Physical Medicine Associates, Dr. Wong, the surveillance videos and "other documents." Id. at 152. In addition, he spoke with Doctors Rodgers and Wong. Id. at 161-63. When asked if Plaintiff could work, Dr. Wong responded: "He could do sit down work; he has a bad back, he is overweight, he can't sit very long . . . . weight loss is primary, but has not been successful . . . . If it weren't for his back, he could work. He is supposed to be seeing a Pain specialist." Id. at 163. Dr. Picks' conclusions were:

> Based on a review of the voluminous records provided, conversations with the physicians of record, as well as review of the surveillance videos, it is my considered medical opinion, to a reasonable degree of medical certainty, that the entire spectrum of information - excepting Dr. Rodgers - does not support a total impairment from gainful employment.
>
> It appears that Dr. Rodgers, as the treating physician of record, is supporting Mr. Ford's stated subjective symptomatology, and validating Mr. Ford's description of significant impairment.
>
> However, objectively, the medical documentation does not support any substantive residual with the exception of history of two operations on the lumbosacral spine, but

---

[6] Dr. Pick was not given a copy of Dr. Gupta's review/report to preserve the independence of Dr. Pick's examination of the issues. AR at 172.

-10-

> without evidence or documentation of a non-union at the L4-5 fusion site. There is no description of hardware failure.
>
> There is no documentation on recent radiographic studies of nerve root compression or displacement.
>
> Although there is a description of left knee partial medial meniscectomy recently and description of significant arthritis in the opposite - right - knee, that [sic] there is no other substantive documentation of total impairment from gainful employment.
>
> Although Mr. Ford is markedly obese, the medical documentation lacks any other substantive objective documentation to validate total impairment from gainful employment.
>
> In the surveillance videos, Mr. Ford is seen to be functioning satisfactorily - with the exception of an inconsistent antalgic gait.
>
> In summary, it is my considered medical opinion, to a reasonable degree of medical certainty, based on the totality of the information provided that Mr. Ford can engage in at least the sedentary work category on a full-time basis.
>
> He can probably engage in the light work category as well. Both of these are on a full-time basis.

Id. at 163-64. On April 28, 2006, Plaintiff's appeal was denied by Hartford. Id. at 171-73.

## II. DISCUSSION

### A. Applicable Law

The Supreme Court in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), addressed "the appropriate standard of judicial review of benefit determinations by fiduciaries or plan administrators under ERISA." Id. at 105. As recently noted by the Court in Metropolitan Life:

> *Firestone* set forth four principles of review relevant here.
>
> (1) In "determining the appropriate standard of review," a court should be "guided by principles of trust law"; in doing so, it should analogize a plan administrator to the trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries). Id. at 111-113 [citations omitted].

> (2) Principles of trust law require courts to review a denial of plan benefits "under a *de novo* standard" unless the plan provides to the contrary. Firestone, 489 U.S., at 115 . . . ; see also id., at 112 [citations omitted].
>
> (3) Where the plan provides to the contrary by granting "the administrator fiduciary *discretionary authority* to determine eligibility for benefits," Firestone, 489 U.S., at 115 . . . (emphasis added), "[t]rust principles make a *deferential standard* of review appropriate," id, at 111 . . . (citing Restatement [(Second) of Trusts] § 187 (abuse-of-discretion standard) . . . emphasis added).
>
> (4) If "a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest*, that conflict must be *weighed as a 'factor* in determining whether there is an abuse of discretion.'" Firestone, supra, at 115 . . . (quoting Restatement § 187, Comment d; emphasis added . . .).

128 S.Ct. at 2347-48. The Court in Metropolitan Life went on to find that an insurance company, which serves as both an administrator and the insurer of an employer's long term disability plan governed by ERISA, has a conflict of interest under the fourth factor in Firestone. Id. at 2348-50. Where such a conflict arises in the context of a discretionary benefit determination, "[t]rust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." Id. at 2350. The Court further observed:

> ... when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. This kind of review is no stranger to the judicial system.
>     \*    \*    \*    \*    \*    \*
>     In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. [Citation omitted.] It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias

> and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Id. at 2351. Accord Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 967-69 (9th Cir. 2006) (en banc).

The nature of the deferential standard of review is delineated in Boyd v. Bell, 410 F.3d 1173 (9th Cir. 2005), which states:

> An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact. Bendixen v. Standard Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999) [citations omitted.]
>
> "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 622 (1993) . . . .

Id. at 1178. In considering the administrator's decision regarding a plaintiff's disability, the reviewing court cannot substitute its judgment for the administrator's. Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2005). As further observed in Jordan:

> We can set aside the administrator's discretionary determination only when it is arbitrary and capricious. We have held that a decision "grounded on *any* reasonable basis" is not arbitrary or capricious, and that in order to be subject to reversal, an administrator's factual findings that a claimant is not totally disabled must be "clearly erroneous."

Id., quoting Horan v. Kaiser Steel Retirement Plan, 947 F.2d 1412, 1417 (9th Cir. 1991).

### B. Analysis

#### 1. Introduction

In the Complaint at ¶ 16 on page 4, Plaintiff indicates that he "received long term disability benefits until August 31, 2005 after which time Defendants have denied

further disability benefits." It is not disputed that under the Policy "in making the benefit determination", the Defendant has "discretionary authority to determine [Plaintiff's] eligibility for benefits and to interpret the terms and provisions of the policy." AR at 707 and page 11 of Plaintiff's Opening Trial Brief ("POT Brief"). Thus, the issue herein is whether Hartford abused its discretion in terminating Plaintiff's disability benefits in August 31, 2005 and denying his appeal on April 26, 2006.

Plaintiff does not appear to argue that Hartford has rendered a decision without adequate explanation or construed provisions of the Policy in a way that conflicts with the plain language of that plan. Plaintiff raises the following contentions: 1) "Hartford conducted a biased investigation" (POT Brief at 14); 2) "Hartford's peer review doctors failed to credit and essentially ignored all medical evidence which states that Plaintiff is totally disabled" (Id.); 3) Hartford overly relied upon and misinterpreted the March 2005 surveillance materials (Id. at 14-15); 4) "The opinion of Hartford's peer review doctors that Plaintiff is capable of sedentary level work full time is not supported by 'substantial evidence'" (Id. at 20); and 5) Hartford's conflict of interest in this case combined with certain other actions which it took should be weighed strongly and justifies setting aside Hartford's determination as an abuse of discretion (see Plaintiff's Supplemental Trial Brief).

### 2. Hartford Did Not Reply upon Clearly Erroneous Findings of Fact

Hartford's decision that is the subject of this review concerns whether Plaintiff was disabled (i.e., physically impaired to such a degree that he was continuously unable to engage in any occupation for which [he was] . . . qualified by education, training or experience," (see AR at 009) as of August 31, 2005. The August 31, 2005 termination notice letter states: "We have completed our review of your claim for continued benefits and have determined that you <u>no longer</u> meet the definition of Total Disability as defined in the . . . policy . . . ." Id. at 131 (emphasis added).

-14-

It is not disputed that Hartford initially found that Plaintiff was disabled such that he could not perform his regular occupation as a field service engineer from the date he left his job (i.e., December 24, 1999). See AR at 672. The initial medical reports indicated that Plaintiff's disability arose from "multi-level disc disruption syndrome - lumbar spine". Id. at 812. While initially questioning Plaintiff's "any occupation" disability in February of 2002, Hartford did not terminate payment at that time and began making "any occupation" benefit payments after Plaintiff provided a letter from Dr. Grahm (a neurosurgeon) stating that Plaintiff's discogram "was strongly positive at L4/5 . . . with marked degeneration and leakage of dye from a posterior tear." Id. at 621-23. Dr. Grahm recommended back surgery with a "two-level transverse interbody fusion with posterolateral fusion at L4/5 and L5/S1." Id. at 623. The need for surgery was confirmed by the lumbar mylogram conducted by Dr. Gordon in February 2004. Id. at 440-41. That surgery was performed in June of 2004 by Dr. Gordon who reported in a follow-up examination in July that the "lumbar wound was well-healed" and there were no "significant neurogic defects." Id. at 415.

In deciding that Plaintiff could do sedentary level duty work and hence did not remain disabled from any occupation, Hartford relied, inter alia, upon: 1) the results of the back surgery, 2) the lack of post-surgery objective medical documentation such as "radiographic studies of nerve root compression or displacement" (see AR at 163) or functional capacity studies to support any claimed impairment, 3) the two independent medical reviews by Doctors Gupta and Pick, 4) the surveillance videos, and 5) the assessment of employability by Dyenson. Such material constitutes substantial evidence upon which Hartford could base its decision herein. See i.e. Hillery v. Metropolitan Life Ins. Co., 453 F.3d 1087, 1091-92 (8th Cir. 2006); McKenzie v. General Telephone Co. of California, 41 F.3d 1310, 1317-18 (9th Cir. 1994). As stated in Boyd: "We hold that a mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused its discretion, for even a single persuasive medical opinion may constitute substantial evidence upon which a plan administrator may rely

1  in adjudicating a claim." 410 F.3d at 1179

2        Plaintiff argues that Doctors Gupta and Pick ignored the statements from
3  Plaintiff's treating physicians which found that he had a serious degenerative back
4  condition. This Court disagrees. Doctors Gupta and Pick did not ignore the medical
5  history, they simply reached different (and quite reasonable) conclusions than those
6  proffered by Plaintiff. As observed in Snow v. Standard Ins. Co., 87 F.3d 327, 331
7  (9th Cir. 1996): "that the plan administrator's decision is directly contrary to some
8  evidence in the record does not show that the decision is clearly erroneous." First,
9  those medical reports in regards to back pain and concomitant functional restrictions
10 which were documented prior to Plaintiff's June 2004 surgery cannot be utilized as
11 significant evidence of his condition following the surgery. Second, the post-surgery
12 medical reports as to his back condition consist mostly of the mere recordation of his
13 subjective descriptions of pain and/or lack of pain. Third, those medical reports,
14 especially from Dr. Rodgers, are inconsistent. For example, on October 6, 2004, Dr.
15 Rodgers notes that Plaintiff's back operation: "seemed to help for a little while and
16 then the pain returned shortly thereafter. He has a chronic, intractable situation, and
17 he is deteriorating. **** At this time, he is determined to be permanently disabled and
18 will likely require medications for his lifetime." AR at 396. Yet, a mere sixteen days
19 later, Dr. Rodgers writes that: ". . . recent re-surgery with fusion of the lumbar spine
20 that was much more successful than his previous surgeries. **** He's doing fairly
21 well. **** He thinks if he can get off the Oxycontin onto something like occasional
22 vicodin he feels like he could return to the work force and I find that very, very
23 encouraging.**** Prognosis is actually very good at this point." Id. at 395. On
24 November 1, 2004, Dr. Rodgers observed: Plaintiff "has had surgery on his back by
25 Charles Gordon, M.D. and he had a very successful surgery. He has very little pain in
26 the lower extremity, does have some chronic pain in the low back." Id. at 394.
27 Fourth, a plan administrator need not accord special deference to conclusory medical
28 opinions even if offered by a treating physician. Black & Decker Disability Plan v.

Nord, 538 U.S. 822, 831 (2003). Fifth, Plaintiff and Dr. Rodgers' assertions of total disability were belied by the March 2005 surveillance video.

Plaintiff did develop a knee problem which was primarily noted in Dr. Rodgers' record on November 17, 2004 when Plaintiff "was doing extremely well postop, as a matter of fact he got off the Oxycontin and was looking forward to going back to California and building assembly robots." AR at 393. As to the seriousness of the knee problem, the March 29-31, 2005 surveillance video shows Plaintiff walking with a gait and with a knee brace (for two of the three days) but able to walk, open doors, carry objects, get in and out of cars, etc. Plaintiff had knee surgery with Dr. Wong in February of 2006. Id. at 204. Dr. Pick stated that Dr. Wong informed him on April 12, 2006, that Plaintiff "could do sit down work . . . [but] he can't sit very long." Id. at 163. Hartford did not clearly err in concluding that Plaintiff had the "capacity to function within a sedentary level of physical demand activity" after his knee surgery. AR at 172-73.

As to Plaintiff's contention that Hartford conducted a "biased investigation", Plaintiff fails to cite to any evidence of such misfeasance. It is noted that Plaintiff was paid benefits from March 24, 2000 through August 31, 2005, the period of investigations by Hartford. The only affirmative contention raised by Plaintiff is that Hartford spent "a disproportionate amount of time in investigating Plaintiff and put him under surveillance on multiple occasions rather than honestly evaluating his claim from a medical view point." POT Brief at 5. However, placing Plaintiff under surveillance on multiple occasions is not a violation of the Policy nor has Plaintiff cited to any law or regulation that was transgressed. Moreover, as noted above, this Court has found that Hartford properly evaluated his claim from a medical viewpoint.

Finally, as noted above, this Court finds that Hartford, Dr. Gupta and Dr. Pick did not place improper emphasis on the surveillance videos and further agrees with their interpretation of what the videos show. In turn, as already noted above, this Court disagrees with Dr. Rodgers' conclusions in regards to the surveillance video.

### 3. Conflict of Interest

Following the Supreme Court's decision in Metropolitan Life, this Court requested further briefing from the parties in regards to the effect, if any, of that decision on this case. As held in Abatie, 458 F.3d at 970, this Court could in its discretion have received extrinsic evidence on the issue of evaluating the effect of the admitted conflict of interest on this case. Plaintiff did not cite to or otherwise present any such extrinsic evidence.

As held in Metropolitan Life, a conflict of interest is merely one consideration in determining the correctness of a decision amid "several different, often case-specific, factors, reaching a result by weighing all together." 128 S.Ct. at 2351. The conflict of interest factor will prove most important where the circumstances suggest a likelihood that it actually had an actual effect on the benefits decision; for example, where an insurance company administrator has a history of biased claims administration. See id. Here, there is no such evidence of institutional or pervasive bias.

Plaintiff does attempt to place his case into the Metropolitan Life scenario by arguing that Hartford did, like the administrator in Metropolitan Life, encourage Plaintiff to argue to the Social Security Administration ("SSA") that he could do no work and also emphasized certain medical reports that favored denial of benefits while de-emphasizing contrary medical documentation. Id. at 2351-52. This Court does not find Plaintiff's contentions to be convincing. First, the administrator in Metropolitan Life did other improper acts which Hartford here clearly did not do; for example, fail to provided its independent vocational and medical experts with all of the relevant evidence. Id. at 2352. Second, this Court has already ruled above that neither Hartford nor its independent medical reviewers (Doctors Gupta and Pick) improperly ignored relevant evidence to achieve an erroneous result. Finally, Plaintiff is correct that Hartford in February of 2003 did encourage Plaintiff to apply for Social Security disability benefits. AR at 583. However, that conduct was neither unlawful, improper

or even inconsistent. At that time, Hartford had found Plaintiff to be "disabled" under the Policy as to his own occupation and was itself paying him disability benefits. Moreover, also at that point, Plaintiff had not yet had his back surgery. Thus, that aspect in this case is not similar to the Metropolitan Life situation where "Metlife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so..., and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work." Id. at 2352. Indeed, Hartford made its determination three years (and one surgery) after the SSA decision. Furthermore, Hartford at that time was not bound by any prior award by the SSA. See Madden v. ITT Long Term Disability Plan, 914 F.2d 1279, 1285-86 (9th Cir. 1990) (holding plan fiduciary did not abuse discretion in crediting medical evidence in record showing lack of disability notwithstanding social security award in favor of the claimant).

The evidence and resolution of issues in this case are not so close that the conflict of interest factor would play a determinative role in its outcome.

## III. CONCLUSION

For the reasons stated above, this Court finds that Hartford did not abuse its discretion in deciding that Plaintiff was no longer disabled under the Policy as of August 31, 2005 because he was capable of sedentary level work.

Defendants are to prepare a proposed Judgment to be filed with the Court by August 15, 2008.

DATED: This 8th day of August, 2008

_____
GEORGE H. WU
United States District Judge